DEXTER ANDERSON *v.* ESTATE OF CHARLES D. ANDERSON.

*Jurisdiction. Probate Court. Guardian and Ward. Domicil. Insane Person. Statute, (Gen. Sts., ch. 48, § 17.)*

A guardian of an insane person becomes substituted by his guardianship for his ward with reference to all his interests, to act for him in the management of his property, and to fix the locality of his person, and determine his domicil.

Where a person removes from one place to another, with the intention of remaining at the latter, as a place of fixed present domicil, for an indefinite time, it is to be deemed his place of domicil, notwithstanding he may entertain a floating intention of returning at some future period.

Where a man resided with his family, and did business at Woodstock until he became insane, and was then removed to the asylum at Brattleboro, to appearance hopelessly insane, and in about two years died there, and when taken insane a guardian was appointed who settled up his ward's business at Woodstock, and moved his family and personal effects to Montpelier to reside there, in accordance with the desire of the ward's wife, until the death of the ward, or until he should become sane and manage his own affairs, and she resided there when her husband died, and has resided there ever since her said removal, it was *held* that the domicil of the ward was changed from Woodstock to Montpelier, and that he resided there at the time of his death, within the meaning of section 17 of chapter 48 of the General Statutes, which provides that the probate court where a person resides at the time of his death shall have jurisdiction in the settlement of his estate.

THIS was an appeal from an order of the probate court appointing Helen H. Anderson administratrix of Charles D. Anderson, her late husband, deceased. Trial by the court, March term, 1869, Washington county, PECK, J., presiding. The facts are fully stated in the opinion. •

It was conceded on the part of the appellant that on account of the business relations existing between him and the estate, growing out of the business relations between him and his son in his life-time, it would not be proper to grant the administration to him, the appellant. The court affirmed the decree of the probate court, and ordered decision certified to probate court; to which the appellant excepted.

*Julius Converse* and *Redfield & Gleason*, for appellant.

*Heaton & Reed*, for defendant.

The opinion of the court was delivered by

WILSON, J.  This was an appeal from an order of the probate court, for the district of Washington, appointing Helen H. Anderson administratrix of Charles D. Anderson, her late husband. The case comes into this court on exceptions to the judgment of the county court, and the principal question is whether the probate court in that district had jurisdiction to settle his estate.  It appears that Charles D. Anderson resided many years in Woodstock. In 1864 he married Helen H. Holmes, daughter of Edwin C. Holmes of Montpelier.  He took her to his house in Woodstock, where they resided, and he was in trade there, a member of the firm of D. Anderson & Son, until some time in June, 1866.  In June, 1866, while said Charles D. Anderson was residing in Woodstock, and pursuing his business there as a merchant, he became insane, and by the advice of his physicians he was sent to the insane asylum at Brattleboro, and consigned to the care of Dr. Rockwell.  It appears that soon after he was sent to the asylum, the said Edwin C. Holmes, at the request of Mrs. Anderson, made application to the probate court, in the district of Hartford, to have a guardian appointed for her husband, and as such guardian for him the probate court, on the 4th day of July, 1866, appointed said Holmes.  The guardian, within a few days after his said appointment, commenced making an inventory of the property of the said Charles D. Anderson.  He made inquiry of Dexter Anderson, the partner of Charles D., as to the situation of the supposed partnership property and business, and was informed by him that Charles D. had no interest in the " concern."  The guardian completed said inventory, which embraced all the property he could find belonging to his said ward, and returned the same to the probate court, but was not able to learn that his ward had any interest in the property or business which had been conducted in the name of D. Anderson & Son.  Before, and at the time Charles D. was sent to the insane asylum, he and his wife had occupied, and were occupying, a dwelling-house in Woodstock, belonging to Dr. Powers, at a rent of $300 a year.  Mrs. Anderson, upon being informed by the guardian, at the time of making said inventory, that said Dexter Anderson, the father of

her husband, claimed that her husband had no interest in the store, expressed herself unwilling to occupy a dwelling-house at a rent of $300 a year any longer, and wished to go to Montpelier to reside. The guardian, on the 16th day of July, 1866, in accordance with the desire of Mrs. Anderson, removed her to Montpelier, to which place she went to reside. The guardian carried to Montpelier the personal property of his ward, including the household furniture and effects. Mrs. Anderson had assigned to her rooms in the dwelling-house of the guardian for her use. The furniture of her husband was used to furnish those rooms, all which she has occupied, and resided there ever since. At the time she left Woodstock and went to Montpelier to reside, the guardian surrendered to Dr. Powers the possession of the dwelling-house previously occupied by the family. The guardian took possession of the property of his ward, paid all or nearly all of his debts, furnished his ward with clothing, and paid all his bills while he remained in the asylum. He remained in the asylum from some time in June, 1866, till his death, which occurred August 5th, 1868, during all which time his wife resided in Montpelier. Section 17 of chapter 48 of the General Statutes provides that " if any person shall die, being an inhabitant of this state at the time of his death, his will shall be proved, or letters of administration on his estate shall be granted, and his estate settled, in the probate district in which he shall have resided at the time of his death." Charles D. Anderson, at the time of his death, was an inhabitant of this state, and his residence or domicil at that time must determine the question of jurisdiction. By the *term* " *domicil*," in its ordinary acceptation, is meant the place where a person lives or has his home. In this sense, the place where a person has his actual residence, or inhabitancy, is sometimes called his domicil. In a strict and legal sense, that is properly the domicil of a person where he has his true, fixed, permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning. A domicil, once acquired, remains until a new one is acquired. If a person has actually removed to another place, with the intention of remaining there for an indefinite time, and as a place of fixed present domicil, it is to be deemed his

place of domicil, notwithstanding he may entertain a floating intention of returning at some future period. (Story on Conflict of Laws, section 46, n. 5.) The place where a married man's family resides is generally to be deemed his domicil. So, too, if a married man has his family fixed in one place, and he does business in another, the place where his family reside is considered the place of his domicil. Section 5 of chapter 1 of the General Statutes, relating to the qualifications of voters for town representative, provides that " the town in which the family of a person shall reside, if he has one, shall be deemed the place of residence of such person." In *Abington* v. *North Bridgewater*, 23 Pick., 170, Chief Justice SHAW, in discussing the subject of domicil, says, " The place of a man's dwelling house is first regarded, in contradistinction to any place of business, trade or occupation. If he has more than one dwelling, that in which he sleeps, or passes his nights, if it can be distinguished, will govern." From these considerations, it would seem to follow that if Charles D. Anderson had, while sane, actually moved his family to Montpelier, with the intention of remaining there for an indefinite time, as the place of his fixed present domicil, it would be deemed his place of domicil, notwithstanding he intended to carry on business at Woodstock, returning to his family at Montpelier from time to time, when his business would allow him to do so. The case shows that in June, 1866, at the time Charles D. Anderson became insane, his domicil was in Woodstock. While he was insane he had no mind, no intent in regard to his residence, his domicil, his property or his person, and he exercised no free will as to any of these matters. The right of the guardian to change the domicil of his insane ward is founded on obvious principles of humanity and justice, and supported by authority.

If the guardian could not change the domicil of an insane person, he might be required to support him and his family at a place where the price of everything necessary for their support was exorbitant and greatly exceeding the means of the family. When Holmes was appointed guardian he became substituted for his insane ward, with reference to all his interests, to act for him in the management of his property and to fix the locality of his person

40

and determine his domicil. Gen. Sts., p. 484, § 49; *Cutts* v. *Haskins*, 9 Mass., 542; *Upton* v. *Northbridge*, 15 Mass., 237. In the case of *Holyoke* v. *Haskins*, 5 Pick., 20, it appeared that Miss Elliot, the intestate, was *non compos mentis*. She was born in the county of Suffolk, and removed, upon the death of her father, into the county of Middlesex, where she lived as part of her brother's family many years and until her death, being for the last years of her life under a guardian who provided for her support, whose residence was in Suffolk. In that case the court decided that the domicil of a person *non compos mentis* under guardianship may be changed by the direction or with the assent of the guardian; that her domicil at the time of her death was in Middlesex; that the probate court of Middlesex county had jurisdiction, and that letters of administration on her estate granted by the probate judge of Suffolk were void for want of jurisdiction. It was strongly urged that upon the facts, the legal domicil of Elliot still continued in Boston, (Suffolk county,) the place of her birth, notwithstanding her removal to Natick, in the county of Middlesex, and her long residence there, because, by reason of her mental disability she had not, it was said, the power to acquire a new domcil. The opinion of the court in that case was delivered by WILDE, J., in which he says: "It is clear that by our laws a guardian has the same power over his ward that a parent has over his child. He has the custody of his person and may appoint the place of his residence. The domicil therefore of an *idiot* may be changed by the direction or with the assent of his guardian whether expressed or implied." By the civil law, minors retain the domicil of their parents at the time of their decease, although they afterwards remove with the consent of their tutors, curators or relations, because, by the civil law, they are not permitted to change the order of their succession to the personal property, which depends on the law of domicil. But under our statute the right of inheritance is not changed or affected by any change of domicil by the heir. The question in this case is one of jurisdiction and not of succession or inheritance. Two things must concur to constitute domicil or change of domicil by choice; first, residence, and secondly, the intention of making it the home of the party. Charles D. Ander-

Anderson *v.* Estate of Anderson.

son was insane when sent to the asylum at Brattleboro. He continued insane while he remained there, and had no intent as to his residence or domicil. He was sent to the asylum for medical treatment and care, and his guardian kept him there for that purpose, without any intention of making Brattleboro the domicil of his ward. But we think the testimony tends to show that the guardian did intend to change the residence and domicil of Charles D. Anderson from Woodstock to Montpelier. Besides the facts before stated, it appears that the physicians expressed serious doubts, at the time Anderson was taken to the asylum, as to whether he would ever become a sane man, and within six months from that time they pronounced him incurable. The circumstances disclosed by the testimony tend to show that the guardian, in the exercise of his discretion, might remove, and that he did remove, Mrs. Anderson to Montpelier with the intention of remaining there for an indefinite time, and as the place of the then fixed present domicil of the family, there to remain until the death of his ward, or until his ward should become sane and manage his own affairs. The personal presence of the husband at Montpelier was not necessary to constitute his domicil there under the circumstances. If the guardian determined that the domicil of the family should be at Montpelier, and actually removed Mrs. Anderson there with her consent, or if she removed there by his direction, or with his assent, it would constitute a change of domicil from Woodstock to Montpelier, as to the husband as well as his wife. If Anderson had become sane, it is quite likely he would have gone to his new residence and domicil at Montpelier. He had no family establishment at Woodstock after July 16, 1866, and no domicil there after that date. The testimony in the case has a legal tendency to prove that the domicil of Anderson was changed by his guardian from Woodstock to Montpelier; that he resided at Montpelier at the time of his death, within the meaning of section 17 of chapter 48 of the statutes above quoted, and the decision of the county court upon the weight and sufficiency of the evidence is conclusive, and cannot be revised in this court.

The judgment of the county court is affirmed.