EXECUTORS AND ADMINISTRATORS (§ 10*)—PLACE OF PRINCIPAL ADMINISTRATION—"DOMICILE."

Where one, born an English subject in Canada, removed to New York, there engaged in business, became naturalized, afterwards closed out his business, declared his intention to return to his place of birth to live, then became non compos, and a committee was appointed for him in New York, who took him back to his place of birth, where he resided till his death, a sufficient "domicile" was re-established there to confer probate jurisdiction in the first instance on the courts of that country, which took cognizance of his will.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 22, 23; Dec. Dig. § 10.*

For other definitions, see Words and Phrases, vol. 3, pp. 2168–2179; vol. 8, pp. 7641, 7642.]

In the matter of the application for the revocation of the letters of administration granted to Charles Onesime Robitaille on the goods, chattels, and credits of Onesime Robitaille, deceased. Decision rendered.

---

Herbert McKennis, of New York City, for petitioner.
Lyman E. Warren, of New York City, for administrator.

FOWLER, S. This is a proceeding to revoke letters of administration heretofore granted by a surrogate for this county and issued to Charles Onesime Robitaille upon the goods, chattels, and credits of his uncle Onesime Robitaille, deceased.

The point now here is: Was the late Onesime Robitaille domiciled in the province of Quebec, Dominion of Canada, at the time of his death, so as to confer jurisdiction prima facie upon the Canadian courts to administer his estate in the first instance, or was his true domicile in our county of New York at the time of his death, so as to make this the principal or proper place of administration? If his domicile was in Canada, certain proceedings taken in Canada on testamentary papers purporting to be the last will and testament of Onesime Robitaille would seem to be prima facie regular, and the administration granted here may have to be revoked or made ancillary to the foreign administration.

It sufficiently appeared on the hearing before the surrogate that Onesime Robitaille, the deceased, was by birth a British subject, having been born of Canadian parents in the province of Quebec, Dominion of Canada. Some 30 years or more ago Onesime Robitaille came from his native place in the province of Quebec, Lower Canada, to New York City, where he ultimately established himself in business as a "haberdasher or gentleman's furnisher," as stated by the witnesses. Whatever his business was, he seems to have prospered in New York and to have accumulated a considerable property, some of which was, apparently, real estate. While the evidence before me is not, perhaps, very sharply defined or presented, it sufficiently appears that Onesime Robitaille lived in New York almost continuously for many years after coming here from Canada. He was ultimately naturalized, and in 1888 he was invested with full citizenship by the United States of America. In 1900, or shortly prior, he sold out his business, but continued to live in various parts of New York City until 1905 or thereabouts. In 1905 proceedings for the appointment of a committee of the person and property of Onesime Robitaille as an incompetent were instituted in the Supreme Court of the state of New York, at sessions duly held for the county of New York, which proceedings resulted in the appointment of his nephew, Elzear Robitaille, of Ancienne Lorette, province of Quebec, as such committee. The committee, shortly after appointment, appears to have departed from New York with Onesime Robitaille to their old home in the province of Quebec, Canada, and there Onesime Robitaille remained with his relatives continuously until his death in the year 1910.

It is apparent that the established courts of the neighboring Dominion of Canada have since assumed some sort of jurisdiction over the administration of the estate of the late Onesime Robitaille, and that they have taken cognizance of certain paper writings purporting to be of a testamentary nature and expressive of the last will of the said Onesime Robitaille. Precisely what is the effect of such pro-

ceedings in the Canadian courts need not now be determined, as their regularity and efficacy are not points now before me at this stage, and I will not consider them.

It is also sufficiently apparent in this proceeding that if Onesime Robitaille, in fact and in law, died testate, domiciled in Lower Canada, the administration proceedings in this jurisdiction should be regarded at most as provisional, and that some sort of ancillary process will be found to be more regular than original proceedings to administer, based on a suggestion of intestacy, when in fact there are extant testamentary papers purporting to be regular. But all these questions of regularity and jurisdiction are reserved for the present. They are very complicated questions. I have had to deal with similar questions since I came into this place. Matter of Elizabeth Connell, 138 N. Y. Supp. 389; Matter of McElwaine, 77 Misc. Rep. 317, 137 N. Y. Supp. 681. The only point now here at this time is this: Was the last domicile of Onesime Robitaille in the province of Quebec ·or in our county of New York? When that issue is determined, further proceedings in this court in accordance with the finding of fact will at least be facilitated.

The domicile of origin of Onesime Robitaille was unquestionably in the province of Quebec, Dominion of Canada. The domicile of origin of a person, in these very modern days, when human society has become 'so mobile and easily transported to distant lands, is of great consideration in the solution of legal questions involving a mixed domicile, as in the absence of positive proofs there is a certain presumption of permanence now attaching to a domicile of origin. Dupuy v. Wurtz, 53 N. Y. 556; Lord v. Colvin, 4 Drew, 366; Stevenson v. Masson, L. R. 17 Eq. 78; Huntley v. Gaskell, L. R. 1906, A. C. 56; Munro v. Munro, 7 C. & F. 842. This was a controlling element in the ultimate decision rendered by the House of Lords in the course of the Case of the Succession to the Historic Lauderdale Peerages, 17 Abb. N. C. 439, L. R. 10 App. Cas. 692. There an American domicile was claimed by the contestant for the ancestor of the present Lord Lauderdale, an officer stationed in New York prior to the War for Independence. If that had been established, the entire course of the contention for the succession to the peerages of Lauderdale would have changed. But the domicile of origin, which was Scotland, ultimately prevailed, and in consequence the contestant, Sir James Maitland, was defeated, ·as the Scotch law was more favorable to claimant's legal contention than was the law of New York before our independence of the British crown.

In this cause now here, Onesime Robitaille, shortly before his final removal to his domicile of origin, as it appears, had an apoplectic seizure, which for a time at least deprived him of self-control, if not of his mind. For some while before this affliction Onesime Robitaille had, however, contemplated a reversion to his domicile of origin, and with a view to that end he had actually sold out some of his belongings in New York, and had packed up his household stuff and furniture, intending to make a final resettlement in his native place among his own people, living in or about Ancienne Lorette, province

of Quebec. His declarations were competent on this point. In re Newcomb, 192 N. Y. 238, 84 N. E. 950. The surrogate has little doubt that this fixed and established intention on the part of Onesime Robitaille was frustrated, if at all, only by his illness mentioned. Before the late Mr. Robitaille could himself consummate his intention to domicile himself in Quebec (Lower Canada), he was deprived to some extent of the power so to do by disease and loss of his senses. But his committee thereafter acted in accordance with his expressed intention, and took him to Lower Canada, to his domicile of origin, which continued at least his de facto domicile until he died.

How far Onesime Robitaille after his stroke ever regained his capacity to decide for himself concerning his legal domicile is in controversy in this cause. I heard on this point the testimony of Madame Cornelia Iovia Robitaille, of Montreal, of Mr. Elzear Robitaille, of Ancienne Lorette, of Mr. Edmond des Aulniers, of Dr. Victor Laurin, of Mr. Octave Roy, and of Mr. Charles Robitaille; and I am bound to say that the evidence on this point is very conflicting. Doubtless, if the late Onesime Robitaille ever did regain his senses after his removal to Ancienne Lorette, and then deliberately fixed his final domicile in the province of Quebec, that constituted a domicile of choice on his part. But I am not persuaded from the evidence that he ever did become sufficiently compos mentis to constitute for himself a domicile of choice, if further intent on his part was necessary. Consequently my decision must rest on the other facts already mentioned as established, and to some extent on the action of the Canadian tribunals which prima facie must, I think, ex comitate, be assumed to be regular and even jurisdictional, unless the last domicile of the late Mr. Onesime Robitaille is established beyond all doubt to have been in New York.

The general rule of modern law, here as elsewhere, is that every person, being sui juris, is free to choose his own domicile, and to change it whenever he pleases, and that his personal law depends on his domicile. Matter of Newcomb, 192 N. Y. 238, 251, 84 N. E. 950. Dicey, after a full consideration of the cases, defines a man's domicile as:

"The place or country in which either he resides with the intention of residence, animus menendi, or in which, having so resided, he continues actually to reside, though no longer retaining the intention of residence, or with regard to which, having so resided there, he retains the intention of residence, though in fact he no longer resides there."

This careful definition, with its very delicate shades and modifications, shows how complicated the law regulating domicile has come to be in modern times. The effect of domicile on status is even now one of the most disputed points of private international law. 37 Law Mag. & Rev. 468. But disputes over the facts constituting legal domicile and concerning definition of domicile are very ancient, and they figure largely in Roman law. Itinerants, such as commercial travelers and students, had no domicile in Roman law, except what is now called "domicile of origin"—i. e., "origo" or "nativitas." In their case "municipem aut nativitas aut adoptio fecit."

Onesime Robitaille, it is to be remembered, was in some respects domiciled in New York, commercially, and when his commerce ended he chose to put an end to such domicile of choice. One domicile of choice never excludes a subsequent choice of a different domicile.

The fact that Onesime Robitaille became a citizen of the United States during his stay in New York has been already noticed. It would seem important, in relation to domicile; but it is not so at this epoch. Nationality is not, and never has been, recognized as the basis of the personal law by the jurisprudence of the common law. A man may have a domicile quite apart from his nationality. The old conception of perpetual nationality, which, in a mode of singular contradiction almost anomalous, the United States abandoned only after many others of the great powers had abandoned it, plays no part in my conclusion in this cause, because for good reason the law now repudiates nationality as a proper basis of a domiciliary status. While to many of us to change one's country, "exuere patriam," is abhorrent, and at all times a sad necessity we shrink from, yet the hardships of modern existence or an inexorable fate, or too harsh and stern governmental rule in the old lands, or economic inequalities, often compel such a change in the case of those less favored in the struggle for human existence. Law with its accustomed resiliency now recognizes such an expatriation as a primal human right. Wharton, Conf. Laws, § 4. Some men now change their country as they change their clothing, and the world at large has come to approve. Thus it is that the law has abandoned nationality as a test of domicile. The naturalization of Mr. Onesime Robitaille does not, therefore, figure in my conclusion in this cause. What he so readily assumed he might as readily lay aside, had he chosen. Wharton, Conf. of Laws, § 40. It is in evidence in this cause that Mr. Onesime Robitaille never voted, and that he had himself, about the time mentioned, given away his American flags, with the statement that he would "have no more use for them." Could any one fact be more significant of an intention to repatriate himself in his native country?

As a rule, in order to establish a domicile of choice, two facts must concur: Animus, or intent, and at some time the de facto domicile intended. Intent or choice is not enough. Actual domicile must also be established in order to constitute a domicile of choice. Now here, before Mr. Onesime Robitaille's illness, his own intent to re-establish his final domicile in his native land was fully made out; but before he could resort to the place chosen he became incompetent to do so suo animo. Yet his committee took him to the place of his choice, and there, as he himself had intended, he died. Does the action of the committee supplement the established intention in this case, so as to constitute a domicile of choice on the part of Onesime Robitaille? That is the main question for me, and so far as I know the circumstances established in this cause differ somewhat from any reported adjudication. The intention of the late Mr. Onesime Robitaille to resort to his old home, there to end his days, being established, and the fact that his domicile was changed concurring, does it matter that the actual change was effected without his will,

so to speak? On this point I confess I am in great doubt. Lord Loughborough, in Bempde v. Johnston, 3 Ves. 198, certainly intimates that a lunatic may take a residence or domicile of his own, independently of his committee. This, if correct, is only to say that a die facto residence may suffice to make a domicile for an incompetent. But here intention is generally said to be not enough to constitute change of domicile, because of the locus penitentiæ or right to change involved in every intention before consummation.

Where, however, a fixed intent is once established on the part of Mr. Onesime Robitaille, does it really matter how or when the intent was consummated if it was in fact consummated? The incapacity of Mr. Robitaille, while it deprived him of power to execute his intention, certainly also deprived him of power to change his intention. Thus we have, in any event, an unalterable intention on the part of Mr. Robitaille himself as a fixed premise in this cause. This is a very singular fact.

The legal domicile of a person non sui juris has given rise to much controversy among the jurisprudents of different countries. Story says:

"It has been held that a guardian may change the domicile of his ward, so as to effect the right of succession, if it is done bona fide and without fraud. And this seems recognized as the true doctrine in America." Story, Conf. Laws (1st Ed.) § 506.

These are very direct and weighty words from the American peer of any foreign jurist of modern times. With his countrymen Justice Story's words should always carry great weight on such a subject as this, no matter how far foreign jurists may now differ from him. Our law lives and prospers through the great men of our own nation, and not through the support and wisdom of those great men alien to us in condition or blood. To be sure, the later American editors of Justice Story's Commentaries would appear disposed to confine his remarks to a change of residence within the same state or country. But I do not attach much importance to such limitations not of his own making, as Justice Story was commenting on international law, or the law prevailing among foreign states and countries, and not upon intrastate law. It is an affront to his intelligence to so limit his plain observations to a subject which was in no way the subject of his Commentaries. Justice Story was capable of stating his own limitations of his generalities, and in so plain a case as this he must be taken to have meant what he said. His editors have, in my judgment, no right to divest his distinguished words of their final authority. That in a proper case, as Justice Story states, a committee, or even the guardian, of a person incapax, may restore the domicile of origin of his ward, if it is done bona fide, I have little doubt, even if the domicile of origin is in a foreign state. That is this case, only here it was done pursuant to the animus or intent of Onesime Robitaille himself. This is a stronger case even than that stated by Justice Story, for here the incompetent had, when in full possession of his faculties, made his choice of a domicile. In the old law of France such choice, it seems, was conclusive. 4 Phill. 95.

The opinion in Lamar v. Micou, 112 U. S. 452, 472, 5 Sup. Ct. 221, 230 (28 L. Ed. 751), is not, I think, an express authority against the statement by Justice Story already given in extenso. The opinion states:

"But it is very doubtful, to say the least, whether even a guardian appointed in the state of the domicile of his ward (not being the natural guardian or testamentary guardian) can remove the ward's domicile beyond the limits of the state in which the guardian is appointed, and to which his legal authority is confined. Douglas v. Douglas, L. R., 12 Eq., 617, 625; Daniel v. Hill, 52 Ala. 430; Story, Conflict of Laws, 506, note; Dicey on Domicile, 100, 132."

This is an extremely cautious and provisional statement of the Supreme Court of the United States. The court's citation of Story's Conflict of Laws is not, however, to his note, but to the note of some one else, as may be seen when reference is made to the first edition of the Conflict of Laws. It is to be observed with some attention, also, that the opinion in the case of Douglas v. Douglas, relied on by the Supreme Court of the United States in their decision in Lamar v. Micou, is much affected for us in this country by the decision in Potinger v. Wightman, 3 Mer. 80, and Stuart v. Moore, 4 Macq. 1, which are, I think, in better accord with the statement of Justice Story. We, in this state, are at liberty to prefer their authority to the decision in Douglas v. Douglas.

Whether or not the committee of an incompetent has a power of his own motion to constitute a foreign domicile of choice for an incompetent may, as an original question, be one of difficulty. The sovereign from whose jurisdiction the incompetent is taken may view such power in one way for the purposes of a succession ab intestato, while the sovereign of the new domicile may view it quite in another. In that event the question is insoluble, or one of force, vis major, depending in which sovereignty the actual estate may happen to lie. Here this question does not arise, as there is an allegation of testacy, and when testacy is established international rules concerning proper action are in better accord.

But before coming to a conclusion let us examine the state of the authority on the power of the committee to restore his domicile of origin to Onesime Robitaille. In Wood v. Wood, 5 Paige, 596, 605, 28 Am. Dec. 451, the Chancellor of this state affirmed a like power in a guardian to change the domicile of his ward, but subject to the reserved power in the Chancellor to prevent the removal if he saw fit. Such a reserve power needed no restatement. A ne exeat may always issue out of chancery in a proper case. I have no doubt whatever on that point, without reference to any particular authorities. The old books are full of authority on this particular point. We find Wood v. Wood later cited by Surrogate Coffin, a very excellent authority, in Hill v. Horton, 4 Dem. 88, a case not, however, involving an expatriation, and therefore not quite in point here. The right of a guardian to remove his ward or of a committee to remove his charge into a neighboring county of one state, or even into a neighboring state of the Union, is hardly to be doubted at this late date. Hill v. Horton,

4 Dem. 88; Holyoke v. Haskins, 5 Pick. (Mass.) 20, 16 Am. Dec. 372; Anderson v. Anderson, 42 Vt. 350, 1 Am. Rep. 334; Reg. v. Whitley, L. R. 5 Q. B. p. 331; Kirkland v. Whately, 4 Allen (Mass.) 462; Ex parte Bartlett, 4 Bradf. 221; Marheineke v. Grothaus, 72 Mo. 204; Matter of Hyland, 24 Misc. Rep. 357, 53 N. Y. Supp. 717; Matter of Kiernan, 38 Misc. Rep. 394, 77 N. Y. Supp. 924; State v. Lawrence, 86 Minn. 310, 90 N. W. 769, 58 L. R. A. 931; Cutts v. Haskin, 9 Mass. 543; Phillmore, IV, 95, 98; Westlake, pp. 48, 270, 273; 2 Kent's Com. 227, note, 431, note; Savigny, Priv. Inter. Law (Ed. Guthrie) 56, 57, note. As correctly stated by the Master of the Rolls in Potinger v. Whitman, 3 Mer. 79, there is so little to be found in the common law on domicile that we are obliged often to go to the writings of foreign jurists for the fuller discussions of very complicated questions.

The bare right or power of a committee or guardian suo motu to constitute an expatriation of a citizen of the United States may differ somewhat, it seems to me, from the case where such curators merely assist in a repatriation, or in the resumption of a domicile of origin, pursuant to a fixed prior intention of the subjected person, which is this case. In other words, I am inclined to distinguish the cases mentioned. This distinction finds some remote support, I hope, in Wheaton's citation from the Case of The Indian Chief:

"The character that is gained by residence ceases by nonresidence. It is an adventitious character, and no longer adheres to him from the moment that he puts himself in motion bona fide to quit the country, sine animo revertendi." Wheat. Internat. Law, 396.

Now, in this case at bar, Mr. Onesime Robitaille, when capax, had practically "put himself in motion" to resume his domicile of origin. Before executing his intention he became incapacitated. All that his committee did was to execute his intention. Why does not the intention control in this cause on the general jural principle which regards things intended as done? Yet in view of the local character of a committee this may not be within the purview of his powers as such powers imply a stationary and local status. But this is the very point for my consideration in this cause, and it must be resolved, if capable of resolution.

There is, however, another point which has not been at all adverted to on the argument of counsel: The committee in this instance not only accomplished a fixed intention of the incompetent, but he took the incompetent to his own domicile of origin, which happened to be also the domicile of origin of the incompetent. Prima facie the legal domicile of a committee of an incompetent is the domicile of the incompetent, according to some authorities. This is the domicilium necessarium in law. Boileux, 229; 1 Demanté, 206; 1 Mourlon, 195; Sharpe v. Crispen, 1 L. R. P. & D., 611. Sed cf. Westlake, § 239. This debatable point has been settled in France by a provision of the Civil Code, cited by Surrogate Bradford, in his excellent judgment in Ex parte Bartlett, 4 Bradf. 222. But domicilium necessarium never excludes domicilium voluntarium, and where there is a conflict of laws concerning domicile the dominant domicile governs. This is only

to say that domicile is a matter of fact. No doubt such a statement is as true here as elsewhere. But I will not rest on the point of the committee's domicile. The surrogate is not, indeed, persuaded that the domicile of the committee is even prima facie the test of the last domicile of Onesime Robitaille in this cause. Besides, what is the real or legal domicile of the committee in this case is not made sufficiently clear. Presumptively it would be that of the forum of his appointment. In fact, it was at Ancienne Lorette, whatever it was in law.

After much consideration of the many elements determining the last domicile of Mr. Onesime Robitaille, I am satisfied that my conclusion in this cause must rest on other considerations than those last stated. His own fixed intention to establish his domicile where he died is to my mind a very controlling circumstance. His de facto domicile at Ancienne Lorette at the time of his death is another controlling circumstance. These two circumstances being established seem to supersede the necessity of determining finally the power of his committee to change his domicile, or even the necessity of the committee's concurrence in the actual change of domicile to Ancienne Lorette. That the committee did concur in such change is clear. Suppose this was done without legal authority. What then? Is his action to be set aside in this proceeding, when in point of fact the courts of a neighboring and friendly power, finding the incompetent man dead in their jurisdiction, have already taken cognizance of his last wishes expressed in their jurisdiction? Is no presumption of the regularity of such proceedings to be made at this stage of this controversy by this court? It seems to me ex comitate the answer should be in the affirmative, that there is a presumption of regularity. I more readily yield to this conclusion, because all or nearly all of the next of kin and heirs at law of the deceased are residing in the province of Quebec, in the British dominions. To be sure, I am informed that the property of the deceased is largely here; but that matters little, except in so far as it necessitates an ancilliary administration, which will issue as of course.

It is very clear to me in any event that a court of competent jurisdiction may authorize a committee to change the domicile of an incompetent in a proper case, and at this day of easy internationality, even if so doing involves an expatriation, provided it is in the interest of the incompetent himself so to do. What a curious complication the contrary of this doctrine might raise! An insane woman duly domiciled here could not, then, be returned to her own family residing in a foreign land. Because property was found on an insane person in this jurisdiction, that person would have to be detained here under all circumstances, although his best interests were that he should be sent out of the country to his own real home. I cannot admit that such is the law of this state in this day of easy international relations. State v. Lawrence, 86 Minn. 310, 90 N. W. 769, 58 L. R. A. 931, Reg. v. Whitley, L. R. 5 Q. B. p. 331, Wood v. Wood, 5 Paige, 596, 28 Am. Dec. 451, and Story, Conf. Laws, § 506, would seem to support my view of the power of both the court and the

committee to restore an incompetent to his domicile of origin in a proper case. To be sure the courts of this state have not expressly sanctioned the removal of the incompetent in this instance. They have not been in fact asked so to do. But it does .appear that the removal was open and notorious, and that the committee's accounts of expenditures for the foreign maintenance of Mr. Onesime Robitaille were passed on and approved by the courts of this state. This is a sort of judicial sanction which is not to be disregarded by me.

There are some authorities which clearly support the power of the court and even of the guardian to take an incompetent out of the country. As has been stated in this court by Surrogate Bradford the praetor had power to determine the place of abode and education of one non sui juris, citing D. 27, 2: "Ubi pupillus educari vel morari debeat." See Ex parte Bartlett, 4 Bradf. 222. While offhand I think this citation by Surrogate Bradford refers to the Praetor Urbanus and to Roman citizens and territory only, the illustration is not strained. Certainly if a praetor had, as Surrogate Bradford thought, power to sanction any removal by a curator, the courts of this state, now invested with general jurisdiction in law and equity, have in like cases an equal power in a proper instance. That this case would have appealed to our courts, and leave granted, I cannot doubt, had they been applied to by the committee for leave to take Mr. Onesime Robitaille to his old home in Ancienne Lorette to end his days with his kindred. If they would have approved the application then, why not now ratify the action of the committee? In Hill v. Horton, 4 Dem. 88 Surrogate Coffin, very sensibly, I think, held that where the committee of a lunatic, in fixing the residence of a lunatic, was subject to judicial control, until such control is invoked the act of the committee will be deemed the act of the court. Thus I hold now in this case, provided such consent of the court was necessary in this instance, which I do not now hold or determine.

My conclusion is that Mr. Onesime Robitaille's domicile at Ancienne Lorette, in the province of Quebec, whether de facto or de jure, was sufficient in law to confer probate jurisdiction in the first instance on the courts of the Dominion of Canada, and that, if such administration is duly established by authenticated proofs in the proper way, the administration here will be regarded as ancillary, provided, however, due application for ancillary process is made within 60 days next after the entry of the decree on this application.

If, however, any rights of succession of citizens of this country to the estate of Onesime Robitaille in this state are affected adversely by this determination, leave may be had on application for a reargument in this court at any stage of the ancillary proceedings; proper notice being given to the ancillary representatives to be appointed.