ANNIE G. HYDER v. R. B. HYDER et al.
and
FRANK MILLER CO. v. DICKSON, Admr., et al.
(six cases).

Eastern Section. May 27, 1932.

Petition for Certiorari denied by Supreme Court, December 17, 1932.

Miller & DePew and Miller, Miller & Martin, all of Johnson City, for appellants.

Sells. Simmonds & Bowman, Cox, Taylor & Epps, J. N. Edens, Miller & Winston, and Geo. M. Dunn, all of Johnson City, for appellees.

PORTRUM, J.  This record is in this court for a partial review of six consolidated causes upon three discretionary appeals, prayed and granted at as many times during the progress of the cause in the lower court.  The ultimate purpose of the six suits is to bring within the jurisdiction of the court the assets and funds of a former husband and wife, and to distribute these assets among the creditors of each.  The record originally was composed of four volumes of more than a thousand pages, and was supplemented by another upon the suggestion of a diminution, but all the record in the lower court is not included.  We cannot hope to make a satisfactory statement of the facts within a reasonable compass.

(a) On April 8, 1927, Dr. R. B. Hyder and wife, Annie G. Hyder, entered into a contract to sell John W. Lacy and Bruce A. Lacy their residence property, consisting of a house and nine acres of ground, located in Washington County, on the Memphis-to-Bristol Highway, for the sum of $10,000; $100 was paid and the deed was to be executed and delivered as soon as it was prepared and an abstract of title examined, and one week was allowed to perfect the sale.  Before the expiration of this week and the delivery of the deed, Dr. Hyder found another purchaser at a better price by the name of John P. Rhea, and he sold and conveyed this property to Rhea for the sum of $10,500, reciting that the cash consideration was paid, when as a matter of fact Rhea executed his notes for the sum of $3000 for the deferred payments.  The Lacy Brothers were disappointed, and in May they brought a suit against Dr. and Mrs. Hyder, and against the purchaser, John P. Rhea, seeking a specific performance of their contract, but prayed that if they were not entitled to this relief they be granted damages for the breach of the contract on the part of Dr. Hyder, and Mrs. Hyder. This suit was prosecuted through the Appellate Court and the relief of specific performance was denied on the theory that John P. Rhea was an innocent purchaser, but the court decreed a breach of the contract, and that the Lacys were entitled to damages against the Hyders, and remanded the case for a reference to ascertain the damages.

(b) In the latter part of 1927 or 1928, Dr. Hyder, having become infatuated with a young saleswoman in Johnson City, deserted his wife and two minor children and ran away with this woman, settling in Jersey City, New Jersey, where he lived with her as his wife.  At first Mrs. Annie G. Hyder refused to seek a divorce from her husband as he wished, but later she filed a bill for divorce and was granted a divorce and the custody of the children in the Circuit Court.  Prior to this she had filed a bill in the Chancery Court seeking alimony, and averred that John P. Rhea had exe-

cuted to her and her husband his notes in amount of $3000, and this fund belonged to her and her husband in equal amounts. This fund was impounded and the Court decreed her the husband's interest, or $1500, as alimony.

(c) The creditors of Dr. and Mrs. Hyder having discovered this fund due from the purchaser to them, instituted independent attachment bills and garnishment bills against the Hyders and the purchaser Rhea, for the purpose of holding the fund and having it applied to the joint obligations of Dr. and Mrs. Hyder. It is not necessary to name each of the suits and describe the obligations.

(d) The purchaser, John P. Rhea, then filed a so-called bill of interpleading, admitting his obligation on the notes and prayed to be permitted to pay it into court.

Up until this time the litigation was over the funds representing the deferred payments for the house and lot.

(e) At the time Dr. Hyder eloped he carried with him two policies of life insurance in amount of $12,000, and in which his wife was named as the beneficiary. In New Jersey he made application to the insurance companies to change the beneficiary in the two policies from the wife to his estate, and in due time this change was made. On November 12, 1929, Dr. Hyder died suddenly in Jersey City, intestate. His estate there consisted of a case of medical instruments, of no value, and the two policies of insurance. At the request of a brother-in-law of Dr. Hyder, and his mistress, an undertaker prepared the body for burial and shipped it to his former home at Johnson City, Tennessee. These insurance policies were turned over to the undertaker, it having been represented to the undertaker that the insurance was a part of the deceased's estate. These policies were later turned over to an agent of the companies' who had gone from Johnson City to Jersey City to procure them, and the agent returned them to the State of Tennessee, where an administrator for the estate of Dr. Hyder was appointed, namely G. C. Dickson, and with the assistance of the agent the policies were paid to the administrator.

(f) Frank Miller Company of Johnson City was a creditor of the estate of Dr. Hyder in a sum less than $300; it filed its claim and made demand upon the administrator to pay it, this he declined for the reason that he had no assets of the estate in his hands to pay debts, the only assets of the estate being the insurance money, which fund he was advised went directly to the heirs-at-law free from the debts of the deceased. The creditor did not assent to this conclusion, but insisting that Dr. Hyder died a resident and with a domicile in the State of New Jersey, and because of this his personal estate is distributed under the laws of New Jersey. And further, that the laws of New Jersey do not

exempt insurance payable to the estate of the deceased from the debts of the deceased. The administrator denies that the deceased's domicile was in New Jersey, or that the laws of New Jersey distributed the insurance payable to the deceased's estate to his creditors. He took no steps to initiate a proceeding to determine this question in court.

(g) Following this dispute the complainant Frank Miller & Company, as a creditor of the estate, filed what it designates as a general creditors' bill against the administrator, on its behalf and the behalf of all other creditors; it made the heirs at law, the two minor children, defendants, and prayed for the appointment of a guardian ad litem to represent them. This bill did not allege that the estate was insolvent or that a suggestion of insolvency had been made in the County Court, but did allege that the reason the insolvency was not suggested in County Court, was that the estate was in fact solvent. That the insurance money had become a fund for the payment of creditors under the laws of New Jersey and perhaps this fund was sufficient to pay the debts. It sought an adjudication upon this issue. The right to file and maintain the bill was denied in the answer of the administrator. Late in the proceeding the trial court by decree sustained the bill as a general creditors' bill and as one to wind up an insolvent estate of a deceased.

A general creditors' bill is not maintainable against an administrator, but a suit to administer an insolvent estate is, provided the administration has been removed from the County to the Chancery Court. Shannon's Code, Sections 4102-4108; to remove the administration and denude the County Court of jurisdiction it is essential that a suggestion of insolvency be made in the County Court. Arnold v. Burks, 157 Tenn., 18, 5 S. W. (2d), 633. But a creditor has a right to sue an administrator in the Chancery Court and establish his claim, if within the jurisdiction of that court, and also to litigate the issue of the application of the funds in the administrator's hands to the payment of the debts of the estate. This bill is maintainable for this purpose.

This complainant did not follow up its prayer and seek the appointment of a guardian ad litem to make defense for the minors, but it was content to allow the mother and the administrator to answer for them as their regular guardians, since the answer averred their appointment as the regular guardians of the minors. No executor or administrator, having in his hands, as such, any estate of an infant, shall be appointed his guardian, until he shall have first settled his account as executor or administrator. Shannon's Code, Section 4250. Because of the neglect to appoint a guardian ad litem

for the minors, their interests were unrepresented, and their rights denied them as will hereinafter appear.

(h) Pending this litigation, the widow, Mrs. Annie G. Hyder, who was a joint obligator with her husband on many of his obligations, saw that she was hopelessly insolvent, and she filed a voluntary petition in bankruptcy. She sought and obtained her discharge. Mr. Lyle Burrow was elected her trustee, and he intervened in these suits, the bankruptcy court permitting the suit to be proceeded with against the bankrupt through judgment.

(i) On April 30, 1931, the Chancellor entered a decree holding, first, that Dr. Hyder died intestate in the State of New Jersey, and at the time of his death he was a resident with his domicile in that State, and under the laws of New Jersey insurance on the life of a deceased payable to the administrator of the estate is subject, like other personal assets, to the payment of the debts of the estate. That in administering the estate in this State the laws of New Jersey govern in the distribution of the personal estate. Second, that the Lacy Brothers were entitled to damages for the breach of their contract of purchase. Third, that Messrs. Sells, Simmonds & Bowman were entitled to recover from the Hyders counsel fees for services rendered the purchaser, John P. Rhea, who had been made a party to some of the suits, and who had filed the so-called bill of interpleading. Fourth, that Mr. Oscar M. Fair, who represented the Hyders as their attorney in their litigation, was entitled to recover a reasonable fee for his services. A reference was ordered to ascertain the amount of these obligations. By the recital of a subsequent order it appears the administrator attempted to appeal from this decree, but the appeal at that time was denied him. This order of reference contemplated only a claim against the estate of Dr. and Mrs. Hyder, and did not purport to be a settlement of the estate of Dr. Hyder. These six suits were consolidated by order of the Court, looking to a final disposition of the entire matters in the end.

(j) On July 17, 1931, the Master having made his report, the Court with one slight modification confirmed it, and decreed that the Lacy Brothers were entitled to $500 as damages; that John P. Rhea had in his hands $3545.35, from which the Court allowed a deduction of $930.68, representing expenses incurred by Rhea as a party defendant to the suits filed against him and the Hyders. After deducting this amount he ordered Rhea to pay into court the sum of $2614.67. He allowed the firm of Sells, Simmonds & Bowman the sum of $250 with interest from April 20, 1928, as a fee for representing the wife in her suit for alimony, and declared this a lien upon her recovery. He allowed this firm an additional $100 for representing Mr. Rhea in an attachment suit brought against him

and the Hyders by a creditor as above mentioned. And also $200 as counsel for Mr. Rhea in filing the said bill of interpleading. These recoveries the Court declared a lien upon the funds and ordered the Master to pay out the sums to the attorneys. After paying the lien claims he ordered the balance of the funds turned over to the trustee in bankruptcy. He decreed to Mr. Oscar M. Fair, attorney, a fee of $500 as counsel for Dr. and Mrs. Hyder.

This decree attempted only to dispose of certain issues involved in the litigation, and was not an attempt to dispose finally of any one of the consolidated cases, and it was an interlocutory decree. From it the administrator and Mrs. Hyder prayed and was granted an appeal, and perfected the appeal first by filing bonds in the penalty of $250, with a bonding company as surety. These bonds were questioned by the Clerk and Master and at a later date new bonds were filed in the penalty of $750, with the same surety.

(k) In the latter part of August, 1931, the Court entered another decree, at the instance of the complainant Frank Miller Company, sustaining the complainant's bill as a general creditors' bill, and as a bill to administer an insolvent estate. Ordered the filing of all claims against the estate in the cause, and fixed a day in November as the latest for the filing of claims. Then it recites the clerk has been engaged in making out a transcript of the record on the appeal theretofore prayed, and that the Court had declined to permit the administrator to pray an appeal from the decree entered in April. Upon motion of the complainant the administrator was required to pray and perfect an appeal from the April decree now, and five days were allowed him in which to perfect his appeal. The administrator excepted to the coercion, but within the five days he perfected an appeal by filing a bond, and the widow likewise perfected an appeal by filing a pauper's oath. We have before us numerous motions to dismiss all of these appeals because not granted and perfected within thirty days of the final decree. We do not think any of the decrees were final decrees, the appeals were discretionary appeals and a discretionary appeal may be allowed at any term when the Court, in his discretion, thinks that the preliminary questions should be finally determined as a guide to the final disposition of the case. If the insurance fund is not subject to the payment of debts of the estate, then it should be settled before an administration of the estate to save the needless expense and trouble of the administration.

## II

We will dispose first of the appeal, and assignments of error, of Mrs. Annie G. Hyder.

Upon the argument of this case at the bar the Court was con-

vinced that if the case was to be heard upon its merits, the Court must dispense with enforcement of the rules of practice so far as it was in the Court's discretion. The assignments may be applicable to either or both the appellants. We cannot make a division here and discuss them in detail. However, we think we have gathered from the papers the material questions of law and fact, and will attempt to discuss and dispose of them here.

After the trustee in bankruptcy intervened in behalf of the creditors of Mrs. Hyder, in the cases below, the claims were prosecuted to judgment against Mrs. Hyder, notwithstanding she had her discharge in bankruptcy. This is permissible under the bankruptcy act, but perhaps the decree should have contained a reference to the bankruptcy and the discharge of Mrs. Hyder, but her funds were in court and ordered disbursed and not writ of execution was ordered. We think the recital of this decree, and her discharge, will protect her against any execution hereafter issued upon these judgments.

The trustee in bankruptcy declined to appeal from the decree granting the recovery in favor of Sells, Simmonds & Bowman, and declaring the recovery a lien against the fund. Mrs. Hyder insists that she is not liable for counsel fees incurred by another defendant who was sued as her debtor. She insists the trustee violated his trust in acquiescence in this recovery, and in allowing her funds to be thus dissipated to the prejudice of herself and her bona fide creditors.

The trustee makes a motion in this court to dismiss this appeal because not authorized by him. And Sells, Simmonds & Bowman make a like motion, insisting that only the trustee can question their recovery. That under the bankruptcy law all interest of the bankrupt is taken out of her and vested in the trustee. We doubt if the trustee can act arbitrarily in such case when his act violates his trust, that in all cases he has a discretion and if he does not abuse his discretionary powers the Court cannot take from him his control of the case. The trustee elected not to prosecute an appeal for this reason: Dr. and Mrs. Hyder entered into a contract with the defendant Rhea, when the suit for specific performance was filed, to indemnify him against loss or expense growing out of his relationship with them. The trustee thought it doubtful that he could escape the provisions of this contract, and he thought the purpose of it was to discharge obligations such as the one advanced by these attorneys. We think he acted in good faith and clearly within his rights in declining to prosecute the appeal upon this question.

The assignments of error attack several claims which we have not referred to and which were allowed, the amount of these claims

were fixed by a reference to the Master and the Master's report was confirmed by the Court. Under the act creating this court these claims cannot be disturbed if there be any evidence to support them. There was no assignments of error that there is no evidence to support them; the attack is made upon the amount. For instance the Lacy recovery is questioned. The evidence to support this claim is established by a decree of this court, affirming the judgment of the lower court. It is admitted that Oscar M. Fair was the attorney representing the Hyders in the litigation, yet his attorney fee is questioned. We will make no further reference to like assignments; they are overruled.

After considering the assignments of Mrs. Annie G. Hyder as a whole, we are unable to find any error prejudicial to her interest and entitling her to affirmative relief in this court. Her appeal will be dismissed.

Oscar M. Fair, who recovered an attorney fee of $500 against Dr. and Mrs. Hyder, seeks a judgment for this recovery against the surety on the appeal bond in this court. We are without authority to allow this, because this character of claim is not designated in the statute requiring a bond to cover the debt, interest and cost.

## III

The three material questions raised under the assignments of error of the administrator, G. C. Dickson, are:

(1) Was Dr. Hyder domiciled in New Jersey at the date of his death?

(2) Under the laws of New Jersey, is life insurance money payable to the estate of an assured and assets to be applied in the payment of the debts of the estate?

(3) Will the courts of Tennessee, after acquiring jurisdiction of the insurance fund, apply it under the laws of New Jersey to the payment of the debts of the estate?

(1) In 1927 Dr. Hyder eloped with Tressie Nidiffer, a saleswoman twenty-five years of age, and went to Jersey City, New Jersey; at the time of his arrival Dr. Hyder had spent all of his funds, and the woman secured her a job as a saleswoman and took a lease upon an apartment, moving into the apartment and living with Dr. Hyder as his wife. From her earnings she supported herself and Dr. Hyder, and paid the rent on the apartment. Dr. Hyder came of a respected Tennessee family. He was a physician and practiced his profession in Johnson City, Tennessee, while he lived with his wife and two children, and after going to New Jersey he made application to the Examining Board for a license to practice medicine in that State, but this was denied him. He tried to find employment as a ship surgeon, but was unsuccessful. He never found any work in New Jersey and was dependent upon the woman

for his support. He corresponded with the Medical Examining Board with the view of again making application for a license to practice medicine in New Jersey. In the summer of 1929 his wife, in Tennessee, procured an absolute divorce from him; he did not learn of this divorce until the latter part of September, 1929, and this information was a revelation to him of his future prospect and aspirations. He and the woman discussed and determined upon new plans for their future happiness and well-being. He abandoned his hunt for employment as well as a new application to the Board of Medical Examiners of New Jersey, and decided to return to the home of his nativity in Carter County, and there to begin life over again in the practice of his profession. As a part of the plan he was to marry the woman and bring her back to her native state with him, and they were to live together in the county where he was born. This plan was agreed to and initiated by giving legal notice to the landlady that the apartment would be surrendered on the first day of December. It was not known in the community in which they lived that Dr. Hyder and this woman were not legally married, and they desired to keep this fact a secret and arranged with the landlady, who is of foreign extraction and barely understands the English language, to go to the home of her kinswoman in New York City and there to be married. And as a convenient time for all the parties, Thanksgiving Day was selected as the day of the marriage. This arrangement necessarily deferred the return to Tennessee until after the date of the marriage. On the 16th of November Dr. Hyder died suddenly in his apartment.

It is true the witness, Miss Nidiffer, realizing the materiality of her statements of Dr. Hyder's act and intention, made other statements for the purpose of indicating a change of intention on the part of Dr. Hyder. We think these latter statements are unreasonable and made in an attempt to destroy her former testimony. We think the fact above stated is the correct version.

It is clear from the facts that Dr. Hyder had formed an intention to return to his home in Tennessee, and if he had taken one step upon this journey, under the laws of Tennessee, his domicile of nativity in Tennessee would have reverted, and his domicile would have been in Tennessee even though he died in New Jersey. Denny v. Sumner County, 134 Tenn., 468, 184 S. W., 14; Allen v. Thomson, 30 Tenn., 536; Beller v. Baird, 52 Tenn., 39. To prove domicile there must be established the animus et factum, the intention together with a partial execution. ". . . A bare intention to make a particular place one's residence is not sufficient to establish a domicile. There must be some appropriate action harmonizing with the intent. . . . 'A person cannot live in one

place and by force of imagination constitute some other his place of abode. The intent and the fact, as already stated, must concur.' '' Brown v. Hows, 163 Tenn., 184, 42 S. W. (2d), 2110. So when a man starts upon his journey from his domicile of choice to the domicile of his nativity, the courts which recognize this exception consistently hold that his start upon the journey establishes the factum which in turn proves the animus. The fact of residence at one time was given great weight in the establishment of domicile, but the courts now recognize that a man may have more than one residence but only one domicile (Brown v. Brown, 150 Tenn., 89, 261 S. W., 959), and the fact of residence is not now as important in fixing domicile as it once was. When residence was important it was necessary that the man start upon his journey in order to cast off the impediment of his residence at his domicile of choice. Residence is no longer conclusive as an evidence of factum. In this case we have as an evidence of the factum the surrender of the lease, and the negative act of a failure to again apply for a license to practice medicine in New Jersey. We have the express intention clearly proven. Was it absolutely necessary that Dr. Hyder start upon his journey before his domicile of nativity would revert?

There are three classifications of domicile: domicile of nativity, or birth, domicile of choice, and domicile by operation of law (as in the case of wife or child taking the domicile of the head of the family). A person always has a domicile, and the domicile of origin, or birth, clings to the person until another is established by choice or operation of law. A domicile of choice will cling to the person until another domicile of choice is acquired, but this is not true of a domicile of choice when the domicile of origin is again sought, for the moment the domicile of choice is given up the domicile of origin reverts. Denny v. Sumner County, supra. This rule of reverter is spoken of as an exception to the general rule applicable to domicile. And its definition was developed at a time when residence was considered as a controlling factor in the definition of domicile. The cases do not positively negative the idea that the domicile of origin cannot revert until the person has started upon his return, but the definitions states this fact, because the person had begun his journey in the cases under review. We can find no case where the person has made up his mind to change his domicile to the one of his nativity, and has made his preparation but was temporarily delayed in his journey.

The nearest in point is the case of Matter of Robit Kille, 78 Misc., 108, 138 N. Y. S., 391, ''Where a foreigner has been naturalized in this country and was domiciled in New York for a long period, but upon the close of his mercantile operation he decided

to repatriate himself to his native land, but became incompetent and died before he could do so, and it was held that in the absence of positive proof there was a certain presumption of permanence attached to the domicile of origin and that prima facie the courts of the country of such domicile have jurisdiction of his estate.'' But in this case his guardian removed him to Canada before his death.

In Ruling Case Law, Volume 9, Section 20, page 555, it is said:

"Again, where a man has acquired a foreign residence and returns to his own country with the intention of remaining there, his foreign domicile is deemed to be abandoned for every purpose from the time the first step is taken towards abandoning the country, and reverting to the domicile of his origin."

Under the title "Domicile," 19 C. J., Section 3, page 425, it is said:

"When it is evidenced by unequivocal act that the intention to remove exists, a change of domicile is complete, although the family may remain temporarily in the place of the former abode, and conversely, removal with the family is not conclusive of a change of domicile. One's personal presence at the new domicile is not necessary when the intent to change has been manifested and carried out by sending his wife and family there."

The latest reported case dealing with this question that the Court has been able to discover is the case of Re: Estate Evan Jones (1921), 16 A. L. R., 1286. In this case a Welshman came to this country, married and acquired property in Iowa, he was naturalized an American citizen, and after living there many years his wife died. A woman charged that he was the father of her bastard child and instituted proceedings against him; in disgust he decided to return to his native land, and sold his farm and conferred with his banker in reference to the transmission of his funds to his native home. He was advised to deposit his funds and to draw upon the bank when he arrived at his home; he did this and took passage on the ill-fated Lusitania and went down when it was sunk by a torpedo from a German submarine. Under the laws of England, and the older American States of the Union, an illegitimate cannot inherit from a man alleged to be the father, while in Iowa he can. The contest was to decide who was entitled to the estate, which was in a bank in Iowa, whether the heirs at law or the illegitimate child. The Supreme Court of Iowa held that the law recognizing the domicile of origin by reverter was obsolete, and that this doctrine never applied between the States of the Union, notwithstanding it states the definition of Justice

Story, and cites foreign and state authorities, including the Tennessee case of Denny v. Sumner County, supra, which expressly holds the doctrine does apply between the States of the Union. It is not authority for a Tennessee court, and is interesting because of its review of the foreign and domestic cases reviewing and discussing this doctrine.

This Court hesitates to add to the definition found in the authorities, and is content to apply it to the facts of this case. Therefore, it holds that it was necessary that Dr. Hyder start upon his return to the domicile of his nativity before it would revert.

(2) It is proven that there is no statute in the State of New Jersey exempting life insurance payable to the estate of the insured from the payment of debts. The insurance becomes an asset like other personal property for the payment of debts and distribution to the heirs at law. Burial expenses are a preferred claim, and other claims are preferred, but it is not necessary to here enumerate them. The exception to this evidence is without merit.

(3) Will the courts of Tennessee, having acquired the funds, administer and distribute them under the laws of New Jersey or under the laws of Tennessee? This is not an open question, for it has been settled in the case of Ellis v. Insurance Company, 100 Tenn., 177, 43 S. W., 766. This case is directly in point and holds the effects, consisting of policies of life insurance of the estate of a deceased intestate, domiciled in another state, cannot be drawn into this State for recovery by suit and for distribution under our statutes by the devise of having an administrator appointed in this State to obtain possession of the policies and bring them into the State. That was what was done in the instant case. But the Court further held that the surplus would not be turned over to a non-resident administrator, after the estate was administered here and the heirs at law were residents of Tennessee. That a foreign administrator could not sue and recover the assets of the estate in this State. The administrator of Dr. Hyder appointed by the Court of New Jersey cannot recover and take out of this State any surplus going to the heirs at law. Non-resident creditors had the legal right to file and prove their claims in the administration of the estate in this cause, and it is presumed they have done so. They are presumed to know the law and to have complied with it. All foreign creditors who have been mentioned have filed their claims in the cause. To establish these claims it must be shown that they are legal obligations of the estate under the laws of New Jersey, and that the claimants' status are such that they can come into a court of Tennessee with clean hands, and can obtain relief upon a claim that does not violate the public policy of this State.

## IV.

This suit is now pending in the lower court for the filing of claims and final settlement of administration. The administrator was ordered to, and did file a partial settlement of his administration in the cause; he has acquiesced in treating this proceeding as one to finally administer the estate, and he did not seek in this court to have the Frank Miller Company bill dismissed as an administration suit. The creditors have treated it as an insolvency proceeding, and are not entitled to have judgment against the administrator without reference to the insolvency of the estate. The administrator having submitted to the jurisdiction of the Chancery Court the administration should remain under the jurisdiction of the Chancery Court, and the administrator required to make a settlement in the court with the approval of the Court. A Chancery Court has jurisdiction to entertain the administration of a complicated estate, and to aid and direct the administrator, who is the trustee of the estate. This under its right to supervise a trust.

It appears that there are two minors who are the heirs at law of the deceased; the estate is being administered, and that they are not represented by counsel who is in a position to contest the issues in which they are interested, and in conflict with the interests of the administrator. It appears from the administrator's settlement that he has incurred expenses that were not made under the sanction of the Court, or approved by the Court. When the Court has assumed jurisdiction of the administration its approval must be sought in incurring expenses that are not usual within the administration. The minors are entitled to a guardian ad litem to guard and supervise the settlement of the administrator. The guardian ad litem also should protect the estate against a duplication of legal expenses, if it appears the interests of his wards are involved.

The bill makes the minors parties, but does not state the respective issues, and does not negative their right to a year's support. Upon this state of the record this Court is warranted in remanding the case to determine if the minors are entitled to a year's support. But it appears from the deposition of the mother that one of the children was thirteen years of age. It is true this deposition was excluded, and the fact is not proven, but it prompts the Court to take this course and remand the case with directions to the guardian ad litem to determine the fact and petition for the year's support.

Section 4022 of Shannon's Code provides:

"And if there be no widow, or she died before the year's support is set apart, the same provision shall be made for the

children of the intestate, or of the widow, or of both, under the age of fifteen.''

Property set apart for the year's support is in nowise subject to the debts of the deceased. Graham v. Stuff, 8 Pickel, 676, 22 S. W., 738. There is no proof in the record that the law of New Jersey does not provide for a year's support for the minor children of a deceased. In the absence of proof it is presumed that the laws of that state are the same as the laws of this state. But if it were proven that the laws of New Jersey made no provision for a year's support to the minors, it would not be conclusive, for the reason that the year's support is treated as expenses of administration, and is payable as an expense. Jones v. Layne, 144 N. C., 660, 57 S. E., 372; 11 L. R. A. (N. S.), 361.

The case will be remanded with directions to the Chancellor to appoint a capable attorney to act as guardian ad litem for the minor defendant and heir at law, in the protection of his rights. And for this purpose final decrees have not adjudicated the rights of the minor, when he is to be considered as not represented by the administrator, in order that the minor may have his day in court. New and appropriate pleading may be filed on his behalf for the protection of his rights, and this is also true in reference to the other minor who has gained her majority since the filing of this bill, especially in reference to decrees filed during her minority, and which adjudicate her rights when she was not represented properly, if she so elects.

A decree will be entered here in conformity with this opinion, and the case remanded for the purpose of carrying out the directions indicated. The cost of this appeal will be paid one-half by the appellant, Annie G. Hyder, and the surety on her appeal bond, and the other by the appellant G. C. Dickson, administrator, and the surety on his appeal bond. The cost of the lower court will await the adjudication of costs made by the Chancellor.

Snodgrass and Thompson, JJ., concur.